# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

| | |
|---|---|
| HAI TRAN,<br><br>       Plaintiff,<br><br>vs.<br><br>NUCLEAR MANAGEMENT<br>COMPANY, LLC,<br><br>       Defendant. | No. 05-CV-199-LRR<br><br>**ORDER** |

_____

## *TABLE OF CONTENTS*

I.    *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

II.   *PROCEDURAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

III.  *JURISDICTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *3*

IV.  *STANDARD FOR SUMMARY JUDGMENT* . . . . . . . . . . . . . . . . . . . *3*

V.   *SUMMARY JUDGMENT FACTS* . . . . . . . . . . . . . . . . . . . . . . . . . *5*
      A.    *Plaintiff's Failure to Comply with the Local Rules* . . . . . . . . . . . . . *5*
      B.    *Facts* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *6*
           1.    *The Parties* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *6*
           2.    *Employment* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *7*
           3.    *2004 PMP* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *7*
           4.    *PIP* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *9*
           5.    *Termination* . . . . . . . . . . . . . . . . . . . . . . . . . . . . *13*
           6.    *Other facts* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *14*

VI.  *ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *14*
      A.    *Age Discrimination Claims* . . . . . . . . . . . . . . . . . . . . . . . . . *15*
      B.    *Race, National Origin and Color Discrimination Claims* . . . . . . . . *16*

VII. *DISPOSITION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *20*

## I. INTRODUCTION

The matter before the court is Defendant Nuclear Management Company, LLC's Motion for Summary Judgment ("Motion") (docket no. 13).

## II. PROCEDURAL BACKGROUND

On November 18, 2005, Plaintiff Hai Tran filed a Petition at Law ("Petition") against Defendant in the Iowa District Court in and for Linn County. Liberally construed, the Petition contains two groups of claims: (1) discrimination in employment on the basis of race, national origin and color, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and the Iowa Civil Rights Act of 1965, Iowa Code chapter 216 ("ICRA"); and (2) age discrimination in employment, in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq.* ("ADEA"), and the ICRA.[1] On December 6, 2005, Plaintiff served the Petition on Defendant.

On December 27, 2005, Defendant removed the Petition to this court pursuant to 28 U.S.C. § 1441. Defendant invoked this court's federal question jurisdiction, 28 U.S.C. § 1331. On May 10, 2006, Plaintiff filed an Amended and Substituted Complaint, but its

---

[1] The Petition does not contain formal counts and does not cite the laws upon which Plaintiff bases his claims. In relevant part, the Petition states:

> Defendant's termination of Plaintiff violates Iowa and federal law in one or more of the following ways:
> a. discrimination based on race, in violation of Iowa and federal law;
> b. discrimination based upon national origin, in violation of Iowa and federal law;
> c. discrimination based on color, in violation of Iowa and federal law; and
> d. discrimination based on age, in violation of Iowa and federal law.

Petition (docket no. 1) at ¶ 5.

2

Case 1:05-cv-00199-LRR    Document 25    Filed 05/11/07    Page 2 of 20

recitation of the claims is identical to the Petition.

On December 29, 2006, Defendant filed the Motion. On March 30, 2007, Plaintiff filed a Resistance. On April 9, 2007, Defendant filed a Reply.

Neither party requests oral argument, and the court finds that oral argument is not necessary. The Motion is fully submitted, and thus the court turns to consider it.

### III. JURISDICTION

The court has federal question jurisdiction over Plaintiff's Title VII and ADEA claims. *See* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the . . . laws . . . of the United States."). The court has supplemental jurisdiction over Plaintiff's ICRA claims. *See id.* § 1367(a) ("[T]he district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action with such original jurisdiction that they form part of the same case or controversy."). *But see id.* § 1367(c) (granting district courts discretion to decline to exercise supplemental jurisdiction over state law claims under certain circumstances).

### IV. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.,* 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). A fact is material when it is a fact that "might affect the outcome of the suit under the governing law." *Id.* The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *Baer Gallery, Inc. v. Citizen's Scholarship Found. of Am., Inc.*, 450 F.3d 816, 820 (8th Cir. 2006) (citing *Drake ex rel. Cotton v. Koss,* 445 F.3d 1038, 1042 (8th Cir. 2006)).

Procedurally, the moving party bears "the initial responsibility of informing the

3

district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel v. Norman,* 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see, e.g., Baum v. Helget Gas Prods., Inc.,* 440 F.3d 1019, 1022 (8th Cir. 2006) ("Summary judgment is not appropriate if the non-moving party can set forth specific facts, by affidavit, deposition, or other evidence, showing a genuine issue for trial."). The nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. "'Evidence, not contentions, avoids summary judgment.'" *Reasonover v. St. Louis County, Mo.,* 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 809 (8th Cir. 2003)).

The Eighth Circuit Court of Appeals has cautioned that "summary judgment should seldom be used in employment-discrimination cases." *Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir. 1994) (citing *Johnson v. Minn. Historical Soc'y,* 931 F.2d 1239, 1244 (8th Cir. 1991)). Summary judgment is appropriate in employment discrimination cases only in "those rare instances where there is no dispute of fact and where there exists only one conclusion." *Johnson*, 931 F.2d at 1244. To put it another way, "[b]ecause discrimination cases often depend on inferences rather than on direct evidence, summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant." *Crawford,* 37 F.3d at 1341.

Nevertheless, the Eighth Circuit Court of Appeals has also observed that, "[a]lthough summary judgment should be used sparingly in the context of employment discrimination cases, the plaintiff's evidence must go beyond the establishment of a prima facie case to support a reasonable inference regarding the alleged illicit reason for the defendant's

4

action." *Landon v. Nw. Airlines, Inc.*, 72 F.3d 620, 624 (8th Cir. 1995) (citation and internal citation omitted); *accord Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1134-35 (8th Cir. 1999) (observing that the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), must be used to determine whether summary judgment is appropriate).

## V. SUMMARY JUDGMENT FACTS

### A. Plaintiff's Failure to Comply with the Local Rules

Local Rule 56.1(b) requires a party opposing summary judgment to file a response to the moving party's statement of material facts. In pertinent part, Local Rule 56.1(b) provides:

> A response to an individual statement of material fact that is not expressly admitted must be supported by references to those specific pages, paragraphs, or parts of the pleadings, depositions, answers to interrogatories, admissions, exhibits, and affidavits that support the resisting party's refusal to admit the statement, with citations to the appendix containing that part of the record. *The failure to respond, with appropriate citations to the appendix, to an individual statement of material fact constitutes an admission of that fact*.

LR 56.1(b) (emphasis added). After Defendant filed its statement of undisputed material facts, Plaintiff filed a response. Plaintiff's response, however, does not comply with Local Rule 56.1(b), because it does not contain any citations to the appendix. Plaintiff's qualifications and denials of Defendant's individual statements of material fact merely consist of short, unsubstantiated words or phrases.

Under such circumstances, the court deems all of Defendant's statements of material fact to be admitted. LR 56.1(b); *see, e.g., Libel v. Adventure Lands of Am., Inc.*, No. 06-1711, 482 F.3d 1028, 2007 WL 1120329, *2-*3 (8th Cir. Apr. 17, 2007) (discussing identical local rule in the Southern District of Iowa and affirming district court's decision to deem all statements of material fact to be admitted). The court is not required to

5

"'engag[e] in the proverbial search for a needle in the haystack.'" *Libel*, 2007 WL 1120329 at *3 (quoting *Nw. Bank & Trust Co. v. First Ill. Nat'l Bank*, 354 F.3d 721, 725 (8th Cir. 2003)). "Courts have neither the duty nor the time to investigate the record in search of an unidentified genuine issue of material fact to support a claim or a defense." *Id.*

"Even if a motion for summary judgment . . . stands unopposed, the district court must still determine that the moving party is entitled to judgment as a matter of law . . . ." *Interstate Power Co. v. Kan. City Power & Light Co.*, 992 F.2d 804, 807 (8th Cir. 1993). In light of Plaintiff's admissions to Defendant's statements of material fact, the court holds that summary judgment is appropriate and the Motion should be granted. *See Libel*, 2007 WL 1120329 at *3. (affirming grant of summary judgment to defendant when plaintiff similarly violated local rules). Out of an abundance of caution, however, the court shall do its best to investigate the record in search of unidentified genuine issues of material fact and then analyze them in light of the governing law and Plaintiff's arguments in his Resistance. *Cf. Gretillat v. Care Initiatives*, 414 F. Supp. 2d 901, 910 (N.D. Iowa 2006) (alternatively examining record out of an abundance of caution, even though plaintiff failed to respond to defendant's argument), *aff'd*, 481 F.3d 649 (8th Cir. 2007).

### *B. Facts*

Viewed in the light most favorable to Plaintiff and affording him all reasonable inferences, the summary judgment facts are these:

#### *1. The Parties*

Plaintiff was born in October of 1959. His national origin is "Vietnamese," his race is "Asian" and his color is "yellow."

Plaintiff holds a B.S. in nuclear engineering from Iowa State University. He also holds an M.B.A. from Nova University.

Defendant manages nuclear power plants throughout the Midwest. From 2001 to

6

2006, Defendant managed the Duane Arnold Energy Center ("DAEC"), a nuclear power plant in Palo, Iowa.

### 2. *Employment*

In the summer of 1987, one of Defendant's predecessors-in-interest hired Plaintiff to work at the DAEC as an intern. In 1988, Plaintiff began full-time employment at the DAEC as a Technical Support Engineer.

In January of 2001, Defendant took over the DAEC, and Plaintiff became one of Defendant's employees. At the time, Plaintiff was working in the Licensing Department.

At some point prior to 2004, Plaintiff transferred into the Performance Improvement Department and became a Performance Improvement Engineer. Plaintiff was the DAEC's Key Performance Indicator Coordinator. Plaintiff was responsible for managing the "Key Performance Indicators" ("KPIs")[2] program and "backing up" his coworkers.

Throughout his employment at the DAEC, Plaintiff got along well with his managers and coworkers. He had a good attendance record. He did not have any disciplinary problems.

### 3. *2004 PMP*

In 2004, Plaintiff received mid-year and end-of-year performance appraisals. Defendant's system of performance appraisals is known as a Performance Management and

---

[2] Defendant defines KPIs as follows:

> [KPIs] help an organization define and measure progress towards organization goals. [KPIs] are quantifiable measurements, agreed to beforehand, that reflect the critical success factors of an organization. A primary purpose of KPIs is to give everyone in the organization a clear picture of the goals of the organization and what must be done to accomplish the goals.

Defendant's Brief in Support of Motion (docket no. 13-2) at 2 n.1.

7

Employee Development Plan ("PMP").

At mid-year, Plaintiff's then-supervisor, Roy Harter, rated Plaintiff's performance at a "Level B." Level B indicates that the employee usually meets and occasionally exceeds all expectations, requires some amount of management direction, handles assignments in a routine manner, responds or reacts to problems rather than anticipating or preventing them, and customers are generally satisfied or neutral.

At the end of 2004, however, Harter rated Plaintiff's performance at a "Level C." Level C indicates performance that is unsatisfactory and does not meet expectations.

In the year-end PMP, Harter criticized various aspects of Plaintiff's performance. He contended that Plaintiff was argumentative and had poor communication skills. Harter noted that Plaintiff had his emergency-response position taken away from him, because during emergency response drills, both internal and external personnel had difficulties interacting and communicating with him. Harter concluded:

> Hai, the bottom line is that we expect and require more out of you. [We are all required] to add value to the services we provide. You have many years of experience . . . yet have not progressed beyond administrative duties performed by the Performance Improvement [D]epartment. [We] cannot afford to have employees stay stagnant and not develop professionally. . . . . [G]iven your long service . . . , you have yet to retain a position that requires technical skills or have filled an outage position outside of your normal duties.
>
> Your communication skills have led to performance issues that must be addressed and may limit future options. You received feedback in 2003 and during this year that you need to address deficiencies in communication skills. As previously noted, this has impacted your interaction with employees during your normal duties . . . and in your interaction with DAEC and external persons during [emergency-response organization] drills.
>
> I expect you to conscientiously practice continuous

8

> improvement. There is a perception that you have become complacent with your performance. When compared to your peers across the site, it is noted that you have not grown professionally to the same degree and have not broadened your skill set through pursuit of positions in other departments.
>
> You are a valued employee and I have a personal interest in seeing you turn around performance to levels that I know you are capable of. We will work together to develop a performance improvement plan that addresses areas of improvement noted in your performance appraisal. . . .

Def.'s Ex. B (docket no. 13-6) at 6. Harter also expressed optimism that Plaintiff could improve and meet expectations in the future.

### 4. PIP

As he promised in the PMP, Harter placed Plaintiff on a Performance Improvement Plan ("PIP"). Harter prepared the PIP, which initially had a "Target Date for Completion" of April 30, 2005. Def.'s Ex. D (docket no. 13-6) at 1. Generally, if an employee meets the PIP goals before the deadline listed in the PIP, then the employee is taken off the PIP and put back on the regular schedule of biannual PMPs. If the employee fails to meet the PIP goals before the deadline, however, the employee is fired. The PIP contained a number of goals for Plaintiff to meet. The goals were closely related to Harter's concerns, as expressed in Plaintiff's year-end PMP.

In January of 2005, after Harter prepared the PIP, Steven Catron replaced Harter as Plaintiff's supervisor. Catron was one of Plaintiff's contemporaries in terms of tenure at the DAEC and had worked with Plaintiff in the past.

Also in January of 2005, Catron shifted around the responsibilities among the employees in the Performance Improvement Department. Catron did not believe that Plaintiff's responsibility for KPIs necessitated a full-time job. Therefore, he gave Plaintiff

9

the additional responsibility of coordinating the "Self-Assessment Program."[3]

Catron, Gretchen Murphy, the Human Resources Director, and John Bjorseth, the Site Director, discussed Plaintiff's PIP and amended it. After Catron received approval from Murphy and Bjorseth, he discussed the PIP with Plaintiff. On March 25, 2005, Catron and Plaintiff signed the revised PIP.

In the ensuing months, Plaintiff and Catron met periodically to assess Plaintiff's progress under the PIP. As a part of their discussions, the PIP was updated on a number of occasions. For example, Catron included as an additional area for improvement Plaintiff's "ownership of the [S]elf-[A]ssessment [P]rogram and KPIs." Def. Ex. D (docket no. 13-6) at 3. Further, Catron decided not to enforce the April 30, 2005 deadline.

On June 7, 2005, Plaintiff and Catron met. They agreed upon June 24, 2005, as a

---

[3] Plaintiff described the "Self-Assessment Program" as "evaluating your work . . . you're bringing other people from outside the organization or from within the . . . organization to evaluate your own organization and make improvement[s]." Plaintiff's Deposition (docket no. 13-5), at 22. Plaintiff was the "coordinator" for the Self-Assessment Program. *Id.* He testified:

> I'm supposed to make sure that people take the lead to do their own self-assessment or they bring in other people from . . . outside the company or from within the company to do assessment, evaluate their job and make improvement and do something to improve it.
> . . . .
> I wouldn't say I was the main person, but I was the coordinator for that program. People can go to me to do the self-assessment activity, but they can do it on their own. . . . But if they want to know what's the procedure to do that or how do I get a contact person's name from another company in Florida, then they may come to me and ask me if I can find out for them. I am supposed to coordinate with them and lead them, but they can do it on their own.

*Id.* at 22-23.

final deadline for the PIP goals to be met. They also agreed upon four specific criteria that would be used to determine whether Plaintiff had successfully completed the PIP. The criteria were: (1) "Completion of incorporating Catron comments into both the [Key] Performance Indicator Program Improvement and Self[-]Assessment Program Improvement Plans with Catron Approval by June 10, 2005"; (2) "Approval and sending of first e-mail communication to [Key] Performance Indicator owners on June 9, 2005"; (3) "Tran to follow-up with core [Key] Performance Indicator owners to schedule meetings with all of them by June 17, 2005 and at least two of those meetings are to be conducted satisfactorily by June 24, 2005"; and (4) "Training materials for use 'just in time' by personnel performing Focused Self Assessments to be prepared (draft) by June 24, 2005." Def. Ex. D (docket no. 13-6) at 5. The amendment was signed on June 9, 2005 by Catron and Plaintiff, and expressly stated that, if the four criteria were not met, "Hai's employment would be terminated." *Id.*

Plaintiff met the first two criteria. He did not meet the fourth criterion, because he never turned in the requested draft training materials.

Plaintiff also did not meet the third criterion. Plaintiff held four meetings, but Catron was not satisfied with Plaintiff's performance. Catron observed all four meetings and elicited feedback from the highest level manager at each meeting. Some of the highest level managers found Plaintiff's performance to be "okay," but at least one was dissatisfied.

For example, during the fourth meeting, which was scheduled from 10:30 a.m. to 11:00 a.m. on June 23, 2005, Plaintiff held a meeting on KPIs for Steve Haller, the Engineering Director, and Gary Hawkins, the System Engineering Manager. The meeting lasted twenty-five minutes. After the meeting, Haller and Catron privately discussed Plaintiff's performance. Neither was satisfied. Catron believed that Plaintiff "was still not demonstrating a level of understanding and ownership for the [KPIs] [P]rogram." Catron Depo. at 46.

11

After Catron's discussion with Haller, Catron determined that Plaintiff's performance had not significantly improved and, therefore, his employment would need to be terminated on the next day. Catron believed that Plaintiff had not satisfied the third and fourth criteria in the amendment to the PIP. He also believed Plaintiff had not met a number of the goals in the PIP itself. Specifically, Catron believed Plaintiff had not "[d]emonstrate[d] good judgment by communications in meetings that are viewed as contributing to overall discussion," was not "cautious in [his] tone of voice to prevent giving the impression of argument," and was not "be[ing] deliberate to assure clear enunciation." Def's Ex. D at 1; Catron Depo. at 32. A "main sticking point" was Plaintiff's failure to "work directly with DAEC personnel who collect and enter the date for the KPIs to facilitate needed changes and to assure that DAEC staff and management are using that data to drive continuous improvements." Def's Ex. D at 2; Catron Depo. at 35. Plaintiff also failed to, "[p]rior to the beginning of each quarter, . . . work with the managers who have identified a self-assessment to schedule those assessments, assign, lead and get them on the posted schedule." Def's Ex. D at 2; Catron Depo. at 36. In addition, Catron believed Plaintiff did not "demonstrat[e] ownership of [his] areas of responsibility: Self-assessment and KPIs." Def. Ex. D at 3; Catron Depo. at 40.

On June 23, 2005, at around noon, Catron met with Plaintiff and told him that, on the next morning, Plaintiff would need to either resign or be fired. Catron criticized Plaintiff for wasting time in the meeting with Haller and Hawkins; in his opinion and Haller's opinion, Plaintiff repeated himself too much and wasted ten minutes of Haller's time. Plaintiff claims that wasting time was Catron's major criticism of Plaintiff at the time; Catron claims wasting time was "a very minor criticism . . . [m]y real criticism was that in the time allotted he really did not communicate what he was trying to accomplish." Catron Depo. at 80.

In response, Plaintiff hurried away to get to a dental appointment by 1:00 p.m.

12

Plaintiff had previously arranged to take the afternoon off, so he left the DAEC.

### 5. *Termination*

On June 24, 2005, Catron and Murphy met with Plaintiff and informed him that his employment would be terminated if he did not resign. Plaintiff refused to resign, so Defendant terminated him.

As a part of the termination process, Catron gave Plaintiff a copy of an "Employee Performance Concern" ("EPC") and read it to him. The EPC stated:

> Hai has received verbal feedback on several occasions as well as written feedback (2003, 2004, 2005 PMPs and 2005 PIP) regarding deficiencies in his work performance and not completing work on time as scheduled. Despite these efforts, significant improvement did not occur. Hai was placed on a [PIP] on 1/24/05 to address his performance issues associated with communication, initiative, and business acumen. Since the implementation of the PIP, Hai has displayed significant performance shortfalls regarding communication and business acumen including, but not limited to, the following:
>
> 0    Inability to develop a plan to drive better use of site performance indicators. Hai's recommendations for significance level, assigned group, and level of effort for resolving [corrective action plans] have been inconsistent and inadequate.
>
> 0    Inappropriate communication in conducting meetings relative to discussing department performance indicators. Hai too often is argumentative in meetings. Professional communications and interaction with the plant staff are critical for this job[,] and Hai has not demonstrated the ability to consistently meet this requirement.
>
> 0    Feedback from several departments that meetings conducted by Hai often were not productive[,] because he would repeat issues previously discussed[,] such as the purpose of the project and the process to be followed rather than move to the more substantive issues to be

> discussed and determined. This delays progress on the work.
>
> Based on this performance, it is clear that Hai has not taken ownership for the [PIP] and his performance continues to be unacceptable.

Def.'s Ex. E (docket no. 13-6) at 1. Plaintiff told Catron and Murphy that he did not agree with portions of the EPC, packed up his personal effects in a box and left the DAEC.

### 6. *Other facts*

At the time Plaintiff was fired, he was 45 years old. Catron was 41 or 42 years old. Plaintiff was the only racial minority in the Performance Improvement Department. Catron has only fired one employee, Plaintiff. During his years as a supervisor, Catron has hired three employees, and none of them were minorities. Defendant hired John Oldham, a white male in his mid-forties, to replace Plaintiff.

## *VI. ANALYSIS*

Plaintiff concedes that he has no direct evidence of unlawful discrimination. It appears[4] that he urges the court to analyze all of Plaintiff's claims pursuant to the familiar three-part framework set forth in *McDonnell Douglas*, 411 U.S. at 800-06.[5] Under the *McDonnell-Douglas* framework, Plaintiff "has the initial burden of establishing a prima

---

[4] Remarkably, there is no legal authority cited anywhere in Plaintiff's Resistance.

[5] Although Plaintiff's Petition arguably invokes multiple provisions of Title VII, the ADEA and ICRA, the federal analyses do not differ from the respective state law analyses. *See, e.g., Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 933 n.4 (8th Cir. 2006) (equating Title VII and ICRA discrimination claims); *Powell v. Yellow Book USA, Inc.*, 445 F.3d 1074, 1076 (8th Cir. 2006) (same); *Wortham v. Am. Family Ins. Group*, 385 F.3d 1139, 1141 (8th Cir. 2004) (equating ADEA and ICRA discrimination claims); *see also McElroy v. State*, 703 N.W.2d 385, 391 (Iowa 2005) (declining to "forge new ground" under ICRA in the absence of briefing). Accordingly, in what follows, the court only explicitly applies the federal analyses.

facie case of discrimination." *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 934 (8th Cir. 2006). If Plaintiff establishes a prima facie case, "a 'burden of production then shifts to [Defendant] to articulate a legitimate, non-discriminatory reason for firing [Plaintiff].'" *Id.* at 934-35 (quoting *Johnson v. Ready Mixed Concrete Co.*, 424 F.3d 806, 810 (8th Cir. 2005)). If Defendant produces such a legitimate, non-discriminatory reason, Plaintiff "must then demonstrate by a preponderance of the evidence that the stated non-discriminatory rationale was a mere pretext for discrimination." *Id.* at 935. The court first considers Plaintiff's age-discrimination claims and then his race, national origin and color discrimination claims.

### A. Age Discrimination Claims

The court shall assume for the sake of argument that Plaintiff has established a prima facie case of age discrimination. Defendant has produced a legitimate, non-discriminatory reason for firing Plaintiff: Defendant claims that it fired Plaintiff, because he was a poorly performing employee. *See Wittenburg v. Am. Express Fin. Advisors*, 464 F.3d 831, 836 (8th Cir. 2006) (holding that poor performance was a legitimate, non-discriminatory reason), *petition for cert. filed*, 75 U.S.L.W. 3457 (U.S. Feb. 14, 2007) (No. 06-1140).

Plaintiff has not shown pretext. Plaintiff's counsel does not explicitly discuss Plaintiff's age discrimination claim in his Resistance, let alone affirmatively identify *evidence* to show that Defendant's stated reason for firing Plaintiff is a pretext for age discrimination. *See Reasonover,* 447 F.3d at 578 (stating that evidence, not contentions, is needed to avoid summary judgment). Moreover, there is ample evidence in the record that Plaintiff was a poor performer. It is also worth noting that Plaintiff was replaced by someone who was nearly the same age as Plaintiff.

In his deposition, Plaintiff testified that he believed Defendant discriminated against him on the basis of his age, because, at some unknown time in the 1990s, Alliant Energy, a company that previously operated the DAEC and employed Plaintiff, offered an early

15

retirement program to employees when they reached the age of fifty-five. Clearly, the actions of another corporation are wholly irrelevant to whether Defendant discriminated against Plaintiff on the basis of his age.

In sum, Plaintiff's age discrimination claims must be dismissed, because he has not shown pretext. *Twymon*, 462 F.3d at 935; *see also Schultz v. Gen. Elec. Cap. Corp.*, 37 F.3d 329, 333 (7th Cir. 1994) (affirming dismissal of poor-performer's ADEA claim).

### *B. Race, National Origin and Color Discrimination Claims*

The court shall assume for the sake of argument that Plaintiff has established a prima facie case of race, national origin and color discrimination. Defendant has produced a legitimate, non-discriminatory reason for firing Plaintiff, insofar as it claims it fired Plaintiff, because he was a poorly performing employee. *See Wittenburg*, 464 F.3d at 836 (holding that poor performance was a legitimate, non-discriminatory reason). Thus the question once again boils down to whether Plaintiff can show that Defendant's stated reason for firing him is pretextual.

Plaintiff claims that Defendant's decision to fire him was pretextual, because "Catron made certain comments in the past that Chinese/Asians are not really Americans." Resistance (docket no. 20-1) at 3. Plaintiff claims that the third criterion in the June 7, 2005 amendment to the PIP is inherently suspect, because it gave Catron "total control over what constitutes 'satisfactory' performance by Plaintiff." *Id.* at 4. With respect to the fourth criterion, Plaintiff charges that "the decision to terminate Plaintiff's employment was made before certain deadlines for Plaintiff to accomplish goals set forth for him . . . ." *Id.* Plaintiff claims that he had finished the draft on his computer, but the only reason he did not turn it in by June 24, 2005, was because Catron told him on June 23, 2005 that he would be fired the next day. Plaintiff also complains that Catron gave him additional job duties without additional pay and criticized him for wasting ten minutes during the meeting with Haller and Hawkins on June 23, 2005. Further, Plaintiff points out that (1) Catron has

16

never personally hired a racial minority; (2) the only person Catron has fired is a racial minority; and (3) Plaintiff's successor was a white male.

In his deposition, Plaintiff testified that there were five reasons why Defendant discriminated against him on the basis of race, national origin and color: (1) Catron's past comments show that he believes that "all Asians are foreign, [they] will never be American, even if [they] were born here"; (2) Catron added a purely subjective goal to the PIP that Harter prepared, i.e., the goal that Plaintiff demonstrate "ownership" of the KPI Program and the Self-Assessment Program; (3) Plaintiff was the only Vietnamese person to work at DAEC during the last fifteen to sixteen years; (4) at one time in the 1990s, Catron asked Plaintiff to make copies of a document, as if Plaintiff were Catron's "secretary"; and (5) Plaintiff was the only Vietnamese person to work in the Performance Improvement Department.

Plaintiff's complaints are insufficient to prove pretext. The court examines Plaintiff's major arguments, in turn, below.

First, Catron's past comments do not prove any animus toward Plaintiff due to his race, national origin or color. Plaintiff described Catron's comment as follows:

> QUESTION: Why do you believe [Catron] does not like Vietnamese?
>
> ANSWER: A long time ago in the 1990s I used to work with him—with [Catron] as a coworker, and I was talking with him, just chatting, and he told me when he was in college he had a Chinese roommate. And I told him I'm from Vietnam, but I have a Chinese background, too, because my parents were Chinese, so I speak Chinese and I—I speak Chinese at home, but when I go to public, I speak Vietnamese and I also live kind of under Chinese culture. And he said his college roommate had to go to college to learn about Chinese culture. And I said, I don't understand that if you Chinese, you grow up in that culture, why do you have to go to college to learn Chinese culture. I didn't know what he was talking—and he said his college roommate was Chinese. And he keep going, talking,

17

>and then finally I ask him, I said, if he's Chinese, why does he have to go to college to learn Chinese culture. And he said, oh my roommate—Chinese roommate was from Chicago, born in Chicago. I said, oh, so I said, if he was born in U.S.A., he's American. That's why he had to go to college to learn Chinese culture, because he is really American. But he said, no, he's Chinese.

Plaintiff's Depo. (docket no. 13-5) at 12-13. No reasonable fact finder could conclude that this decade-old and benign conversation proves Catron harbors any animus towards Plaintiff's race, national origin or color.[6]

Second, Catron was fully justified in announcing, around noon on June 23, 2005, that Plaintiff would be terminated on June 24, 2005, even though the target completion date for the four criteria was June 24, 2005. As a matter of fact, Plaintiff never provided Catron with the draft document and was not terminated until June 24, 2005. Plaintiff left for the afternoon dental appointment and presumably did not intend to return until the next day. Indeed, Plaintiff did not return to work until the next day. As stated by Murphy, "if the expectation is that you get something done by midnight and you get it done at 11:59, that doesn't necessarily display the competencies we are looking for in an individual." Murphy Depo. (docket no. 24-4) at 61. It is also important that Plaintiff had not cured other deficiencies in his PIP, including the third criterion. The deadline for meeting the third criterion had already passed, because there were no more meetings scheduled and all meetings had to be scheduled before June 17, 2005.

Third, the mere fact that Catron's wording of the third criterion involved some subjective assessment of Plaintiff does not prove pretext. *Cf. Brooks v. Ameren UE*, 345 F.3d 986, 988 (8th Cir. 2003) ("Although subjective promotion procedures are susceptible

---

[6] It is apparent from Plaintiff's deposition that he sometimes has difficulties with English grammar. Plaintiff does not argue that Defendant fired him on account of such grammar, or that firing him for such reason would be unlawful. Plaintiff's ability to effectively communicate is the focus of the parties' arguments.

18

of discriminatory abuse and require close scrutiny, subjectivity alone does not render an employment decision infirm." (Citation omitted.)). Moreover, Defendant took steps to limit subjectivity in the PIP. Murphy testified that there were checks-and-balances built in to minimize subjectivity in all PIPs, insofar as PIPs were reviewed by representatives of human resources and senior management.

Plaintiff's attempt to show pretext rests almost entirely on an attempt to paint Catron as a racist xenophobe who furtively sought to fire Plaintiff on account of Plaintiff's race, national origin and color. Notwithstanding Plaintiff's attack on Catron's character, however, the fact remains that it was *Harter*, not Catron, that initially found Plaintiff to be a poor performer, started the PIP process and drafted Plaintiff's original PIP. Harter's actions severely undercut Plaintiff's claims that Catron is a racist xenophobe. *Cf. Carrington v. City of Des Moines, Iowa*, 481 F.3d 1046, 1051 (8th Cir. 2007) (explaining, in the context of a retaliation claim, that "'[e]vidence of an employer's concerns about an employee's performance before the employee's protected activity undercuts a finding of causation.'") (quoting *Kasper v. Federated Mut. Ins. Co.*, 425 F.3d 496, 504 (8th Cir. 2005)). Defendant's proffered reason for firing Plaintiff is not "patently inconsistent with [Plaintiff's] work record . . . ." *Brooks*, 345 F.3d at 988.

The court has considered all of Plaintiff's arguments regarding his race, national origin and color discrimination claims, including those not specifically discussed here. This is a classic case of a poorly performing employee who was fired after receiving many opportunities to improve and save his job. Under such circumstances, summary judgment is clearly appropriate. *See, e.g., Erenberg v. Methodist Hosp.*, 357 F.3d 787, 792-93 (8th Cir. 2003) (affirming district court's grant of summary judgment on plaintiff's discrimination and retaliation claims, where employer repeatedly warned plaintiff about her poor performance and, after she failed to improve, fired her).

In sum, Plaintiff's race, national origin and color discrimination claims must be

19

dismissed, because he has not shown pretext. *Twymon*, 462 F.3d at 935.

### VII. DISPOSITION

The Motion is **GRANTED**. The Clerk of Court is directed to enter judgment accordingly and assess all costs of this action against Plaintiff.

**IT IS SO ORDERED.**

**DATED** this 11th day of May, 2007.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA